

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

————————————————

No. 02-20-00410-CV

————————————————

IN THE MATTER OF A.K.

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-107606-18

Before Bassel, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

This is Appellant A.K.'s second appeal involving a transfer order from the juvenile court. *See In re A.K.*, No. 02-19-00385-CV, 2020 WL 1646899 (Tex. App.—Fort Worth Apr. 2, 2020, no pet.) (mem. op.). In Appellant's first appeal, we overruled his constitutional complaints, reversed the juvenile court's transfer order due to factually insufficient evidence, and remanded the case to the juvenile court. *Id.* at *13. On remand, the juvenile court entered a second order waiving its jurisdiction and ordering Appellant transferred to an appropriate district court or criminal district court to be prosecuted as an adult for capital murder and aggravated robbery. Appellant challenges that order in this appeal, contending in four points that (1) the evidence is insufficient to support the juvenile court's transfer order, (2) it is a violation of the constitutional prohibition against cruel and unusual punishment and fundamentally unjust to transfer "this intellectually disabled/deficient juvenile" to criminal court, (3) Texas Family Code Section 54.02(c) is unconstitutional on its face and as applied to Appellant, and (4) the second transfer hearing was barred by double jeopardy and by the principle of collateral estoppel. We again overrule Appellant's constitutional complaints, including his new double jeopardy argument, and this time we also overrule Appellant's sufficiency challenge because the evidence demonstrates that the 2020 test results do not indicate that he is intellectually disabled but that he is

more sophisticated than same-aged peers and equally as mature as other adolescents. Accordingly, we affirm.

## II. Factual and Procedural Background

Appellant was fourteen years old at the time that he allegedly committed the underlying felony-level offenses of capital murder and aggravated robbery. Appellant was seventeen years old at the time of the second transfer hearing. The following summarizes the events that led to Appellant's arrest for the two felony offenses, provides a brief recap of the first transfer hearing, and details the evidence presented at the second transfer hearing that led to this appeal.

### A. Appellant's Arrest

Appellant, an alleged member of the 300 Mafia Crips gang, was on probation for burglary and was scheduled to have a detention hearing on the day that the offenses were committed. But on the day of the offenses, Appellant awoke late, left his home, and saw a friend who suggested that they "hit a lick." Appellant "end[ed] up breaking into a house."

Detective Matthew Barron responded to an apartment on Calmont Avenue on May 18, 2018, and found Yesenia Gutierrez face down in the dining room; she was bleeding profusely from a gunshot wound to the head. A spent nine-millimeter shell casing stamped with R-P was recovered from the scene.

A video from a nearby business showed that at approximately 10:55 a.m., two young men—both wearing different shades of blue pullover hoodie sweatshirts—

3

appeared to be walking toward the location of Gutierrez's apartment. Detective Barron's investigation revealed that two young men had seen a PS4 game system in an apartment window and had broken into that apartment by kicking in the door. When they got inside, they demanded a phone from Gutierrez. Gutierrez complied and gave them the phone. She turned away, and the shot was fired, striking her in the back of the head. The shooting occurred at approximately 11:07 a.m.

That evening, some gang officers, who had heard about the shooting and were working in that area, came across Appellant, two other juveniles (L.P. and A.F.), and a man named Devoe Walker. The gang officers stopped the young men for a pedestrian violation a few blocks away from Gutierrez's apartment. During the course of stopping them, the gang officers discovered that Walker was carrying a Ruger P85 nine-millimeter handgun.[1] The gang officers also found that Appellant had in his pocket a loaded magazine that fit the handgun that Walker carried.

Walker agreed to speak with Detective Barron that night. Walker told police that he had contact with Appellant and L.P. after the shooting. Appellant and L.P. told Walker that they had been walking by Gutierrez's apartment when they heard a shot. After they heard the shot, they looked in and saw a man, so they started to run. Walker put two and two together and decided to take the handgun away from

---

[1]The shells in the magazine of the gun were marked as R-P. The firearms lab confirmed that the shells in the handgun retrieved from Walker were consistent with the casing that was recovered from Gutierrez's apartment.

4

Appellant because they were causing the streets "to get hot" in the Las Vegas Trail area.

When the police met with Appellant the following day, he gave several versions of what had happened at Gutierrez's apartment. Appellant ultimately said that he had kicked in the door to Gutierrez's apartment, that L.P. had entered first, that he (Appellant) had followed, that he had demanded the phone from Gutierrez, that she had complied and had given him the phone, and that he was outside the door when the shot was fired. After the shot was fired, Appellant and L.P. took off running.

L.P. told police that Appellant had kicked in the door of Gutierrez's apartment, that they had demanded her phone, that Gutierrez had complied and had turned away from them, and that Appellant had raised a firearm and had shot her as she turned away.

Police arrested Appellant two days after the murder, and he remained in custody at the juvenile detention center from the day of his arrest until the second transfer hearing—a total of 926 days. While in detention, Appellant told a fellow juvenile who was housed with him that he had shot the lady with a Ruger nine-millimeter handgun, that it was supposed to be a robbery, and that L.P. was outside of the apartment during the shooting. Another juvenile told police that on the day of the offense, Appellant and L.P. had been at an apartment referred to as "the studio." Appellant told the juvenile that he had shot somebody. The juvenile said that Appellant was wearing a blue-colored jacket and that he had disposed of that jacket in

the dumpster at the apartment complex. The juvenile said that he saw Appellant with a chrome-colored semiautomatic pistol on the day of the offense.

**B.    Petition for Discretionary Transfer and First Transfer Hearing**

Shortly after Appellant's arrest, the State filed its petition for discretionary transfer to a criminal court. The State later filed an amended petition. The juvenile court held the first hearing on the motion in October 2019—approximately seventeen months after Appellant's arrest. After hearing testimony from Appellant's probation officer and the Fort Worth Police Department detective in charge of the investigation and after reviewing the prediagnostic evaluation with the report of Appellant's latest psychological evaluation attached and Appellant's police interview, along with other evidence of the crime, the juvenile court decided to waive its jurisdiction and transfer the case to a criminal court. Appellant appealed the initial transfer decision, and we reversed the juvenile court's transfer order due to factually insufficient evidence and remanded the case to the juvenile court. *See id.*

**C.    The Second Transfer Hearing**

Because Appellant challenges the sufficiency of the evidence, we set forth a detailed summary of the second transfer hearing beginning with evidence of his prior criminal history.

**1.    Appellant's Prior Criminal History**

In March 2018, Appellant was placed on probation for twelve months for burglary of a building. As part of his probation, Appellant was assigned to perform

6

community service but did not complete it; he had also been placed on electronic monitoring but was noncompliant.

Appellant had also been referred to probation for the offenses of burglary of a building and criminal trespass in December 2017, possession of marijuana in January 2018, possession of marijuana that was pending from May 2018, and criminal trespass that was pending from May 2018.

### 2. Prediagnostic Study

Probation officer Ronnie Mitchell testified that he began supervising Appellant in March 2018. Mitchell prepared a prediagnostic study for the transfer hearing. The prediagnostic study noted under the family-relation subsection that Appellant's mother had indicated that Appellant did not come home at night, that he left for school but did not actually go to school, and that she felt like her only control over him was deciding who could come in their house. Appellant's dad was in jail, and Appellant's family was homeless at one point prior to Appellant's being placed on probation. During the time when Appellant's family was homeless, he spent approximately one year in a foster placement with the All Church Home.

The school section of the prediagnostic study noted that Appellant had a 504 plan to address any behavioral or intellectual special needs that he had within the school environment. With regard to behavioral issues, prior to the May 2018 incident involving Gutierrez, Appellant was involved in fights at school and was suspended once or twice while in middle school and seven times total since he had started

7

attending school. One of his suspensions was related to having drug paraphernalia in his backpack. With regard to intellectual issues, Appellant's pattern at the Middle Level Learning Center was that he mostly earned passing grades with the occasional F but that he normally raised the failing grades to pass for the semester. According to a grade report from July 2019 while Appellant was in detention, he was passing only one class by state standards: he had a 71 average in English/language arts. Appellant's other grades at that time included a 57 in mathematics, a 52 in science, and a 58 in social studies; he also did not pass any part of the STAAR test. At the time of the transfer hearing in December 2020, Appellant was still attending the school in the Lynn Ross Detention Center, and was mostly passing his classes. His October 2020 transcript showed that Appellant was passing English, social studies, and health and that he was failing math and science.

Mitchell prepared a Positive Achievement Change Tool (PACT) full-screen summary report that was updated in August 2020, and attached it to the prediagnostic study. The PACT report showed that Appellant had not committed crimes during the prior six months due to being in a locked-down and controlled environment. The PACT also showed that Appellant's overall risk to reoffend was moderate.

A seven-page printout dated December 2, 2020, was also attached to Mitchell's prediagnostic study. The printout summarized the infractions that Appellant had committed while in detention. Mitchell testified that overall, Appellant's behavior had been acceptable; the majority of the time, Appellant stayed on Level 1—the highest

level of good behavior. But Appellant had some infractions during the thirty months that he had been in detention. Those infractions included, among other things, that he had threatened staff on June 1, 2018; that he had exhibited gang signs and had made gang references in August 2018; that he had instigated fights in March 2019; that he had threatened staff again in July 2020; that he had fought L.P. in August 2020, despite having been ordered not to associate with L.P.; and that he was disrespectful towards staff two weeks prior to the December 4, 2020 transfer hearing. Mitchell testified that each of these infractions was concerning.

### 3. Psychological Evaluations and Psychologist's Testimony

Dr. Monica Jeter, a psychologist who was court-appointed to perform psychological evaluations, testified that she had conducted three psychological evaluations on Appellant. The three psychological evaluations were conducted in June 2018, August 2019, and October 2020.

Dr. Jeter explained that she had conducted the October 2020 psychological evaluation pursuant to the juvenile court's order and that it was part of a prediagnostic study to assist the juvenile court in evaluating whether to waive or to retain jurisdiction in this matter. In preparation for drafting her report, Dr. Jeter had reviewed "all of the documents," which included the prediagnostic study, the previous psychological evaluations that she had conducted on Appellant, and his records from FWISD but not his school detention records.

9

One of the documents that Dr. Jeter reviewed was the "504 Manifestation Determination" from October 2017. That determination noted that Appellant had "engaged in the code of conduct violation of weapon offense" and that the conduct was not a direct result of the school's failure to implement a Section 504 services plan nor was it "caused by or had a direct and substantial relationship to [Appellant's] disability." The 504 committee decided that Appellant's "accommodations [were] sufficient and that his behavior [was] more of a choice rather than [a] disability." The 504 committee reached that same conclusion in February 2018 when Appellant "engaged in the code of conduct violations of weapon and drug offenses."

During Dr. Jeter's interview with Appellant for the June 2018 psychological evaluation, she asked him about his friends, and he related that he was in a gang. Appellant said that he had started hanging out with a thirteen-year-old boy who was a 300 Mafia Crips gang member and that Appellant had joined the gang for a week or two during the 2017 to 2018 school year but then had "got[ten] out." Appellant acknowledged that he had continued to associate with and to represent the gang and that most of the kids from his neighborhood were in that gang. By the time of the 2020 psychological evaluation, Appellant acknowledged that he was in 300 Mafia Crips "once upon a time" for two months but said that he had gotten out of it because they were not faithful and did not look out for each other.

Dr. Jeter's interview with Appellant for the June 2018 psychological evaluation also revealed his drug use and criminal activity. Appellant denied consuming alcohol

10

but admitted that prior to detention he had smoked marijuana—a blunt or two—once a week with others. Appellant also admitted that he had once "tak[en]" a game system and had sold it to a pawn shop for $100. Appellant had stolen candy from the corner store, snacks from Kroger, and a wallet left by a boy. Appellant engaged in setting a fire; he once lit a figurine on fire and put it in a trash can, causing the house to catch on fire. During the 2019 psychological, Appellant related that he had broken into houses to support his drug habit. Appellant described his prior marijuana use as a "zip or two" and changed his prior frequency—weekly—to daily. Appellant told Dr. Jeter that a "zip" was twenty-eight grams and that he had used "four bars every chance [he] had to get [them]."

With regard to his health, Appellant revealed during the June 2018 psychological evaluation that he was taking allergy medication and ADHD medication, which kept him calm. Appellant had no history of psychiatric hospitalization. While in detention, he had engaged in self-mutilation (scratching himself and banging his head) and saw things when his eyes were closed, though he did not have hallucinations; he said that he was seeing a counselor at the detention center. During the 2020 psychological evaluation, Appellant said that he had previously taken medication for sleep and for ADHD but had not been taking medication in detention even though he continued to have difficulty sleeping.

During the two and a half years that Dr. Jeter had known Appellant, she had administered a number of evaluations and tests to determine what his IQ was and

whether he qualified as a person with a severe mental health issue or intellectual disability. Dr. Jeter said that she had administered the following tests to Appellant: the Kaufman Brief Intelligence Test, Second Edition; the Wide Range Achievement Test, Fifth Edition (WRAT); the Minnesota Multiphasic Personality Inventory; the Risk-Sophistication-Treatment Inventory–Self Report (RSTI–SR); and the Structured Assessment of Violence Risk in Youth (SAVRY).

Dr. Jeter explained that the Minnesota Multiphasic Personality Inventory is a personality inventory that examines how a youth functions—both emotionally and behaviorally—within his environment. The test depicted how Appellant functioned and behaved within the community and school. Dr. Jeter's 2020 psychological evaluation noted that Appellant's "profile was similar to youth who have numerous behavior problems in school, family difficulties, poor school adjustment/conduct[,] and use of alcohol or other drugs"; that he may lack self-confidence; and that he may experience feelings of fear/anxiety and self-doubt, engage in physical complaints, and report concentration difficulties. Dr. Jeter's report indicated that Appellant's "profile was similar to youth [who] are enthusiastic, interested in many things[,] and ha[ve] an animated approach to problems" and that his level of energy could lead to antisocial acts.

Dr. Jeter's report summarized the purpose of the RSTI–SR and Appellant's results as follows:

12

The RSTI–SR is a self-report measure designed to assert pertinent psychological constructs for those youth in the juvenile justice system and other relevant high[-]risk settings. It is comprised of the three latent constructs of risk, development-maturity[,] and treatment amenability. The RSTI–SR items are dynamic[,] and this measure can be used as a change sensitive test to determine what characteristics of the youth['s] presentation require treatment.

On the RSTI–SR, [Appellant] endorsed a lack of extensive serious criminal behavior history and [a] lack of exhibition of some psychopathic traits. Test data suggested he has a good sense of who he is as a person, makes decisions independently[,] and weighs the costs and benefits of his actions. Individuals with similar profiles are also quick to recognize and capable of regulating their emotions[. Appellant] endorsed amenability to treatment[,] which is an alliance with a lower level of psychopathology. Individuals with similar profiles generally take responsibility for their troubles and are open to changing their behavior.

With regard to the SAVRY test, Dr. Jeter explained that it is based on how the youth presents and his history and uses a scale to provide an idea of the youth's level of risk. Dr. Jeter testified that Appellant's test results revealed that he

was a high-level severity with his history of nonviolent offending, parent/caregiver criminality, and poor school achievement. Moderate risks: history of violence, childhood history of maltreatment[,] and early caregiver disruption. And a low-level risk at an early initiation of violence, past supervision/intervention failures, history of self-harm or suicide attempts, and exposure to violence in the home. And that was his historical factors.

As it related to social/contextual risks, he was at a high-level severity as it related to stress and poor coping. Moderate level of severity as related to . . . peer delinquency, poor parent management, lack of personal/social support, and community disorganization. And low level of severity is related to peer rejection.

. . . .

13

. . . As it related to individual/clinical risk factors, he was at a high-level severity as it related to risk-taking and impulsivity. Risk factors that were moderate were negative attitude, substance-use difficulty, anger[-]management problems, attention-deficit/hyperactivity difficulties, poor compliance, and low[-]interest commitment in school.

. . . .

. . . Low-level severity was empathy and remorse.

His protective factors were strong social support, strong attachment and bonds, positive attitude towards intervention and authority, and resilient personality traits.

Dr. Jeter was asked about Appellant's maturity and sophistication as compared to a typical seventeen-year-old male:

Q. Is he, based on your evaluations of him, functioning as a fairly typical 17-year-old?

A. I would consider him a fairly typical 17-year-old.

Q. Okay.

A. Not more -- can I rephrase that?

Not more mature than another 17-year-old.

Q. Or less?

A. Well, yeah.

Q. So is he a person who you would characterize as having the same level of sophistication as most 17-year-olds or even higher?

A. I would characterize as perhaps higher.

Q. Why is that?

A. Just based on, like, his street knowledge or awareness, and it could be related to the environment. But I think he has more of a street knowledge or awareness than perhaps someone else his age.

Q. So more sophisticated, not interested in school, just as mature as the same-age peers?

A. Yes.

Dr. Jeter concluded that Appellant's IQ was 81 and that based on his IQ, Appellant is not a person with an intellectual disability.

The defense began its cross-examination by questioning Dr. Jeter about the development of the juvenile brain beginning around age sixteen. Dr. Jeter testified that the brain is not fully developed until a person is age twenty to twenty-five. Dr. Jeter agreed that prior to that time, a juvenile has an inability to delay his gratification and reflect on what he is doing, can exhibit difficulties with problem-solving, may have a hard time with evaluating risks and the consequences of those risks, and may be susceptible to peer pressure.

The defense then questioned Dr. Jeter about the differences between Appellant's 2019 and 2020 scores on the WRAT test and the IQ test. Appellant's scores on the WRAT for those two years are as follows:

|                       | 2019 | 2020 |
|-----------------------|------|------|
| Word Reading          | 56   | 67   |
| Spelling              | 58   | 59   |
| Math                  | 55   | 67   |
| Sentence Construction | 60   | 74   |

15

Dr. Jeter testified that most of Appellant's 2019 WRAT scores were comparable to those performing at the seven- or eight-year-old level and that his 2020 WRAT scores were comparable to those performing at the eight- or nine-year-old level.

Appellant's IQ scores for those years are as follows:

|  | **2019** | **2020** |
|---|---|---|
| Verbal IQ | 79 | 83 |
| Nonverbal IQ | 65 | 85 |
| Composite IQ | 68 | 81 |

When asked to explain what generally accounts for an increase in IQ over time, Dr. Jeter said that education and "exposure to different things that are in those test measures." Dr. Jeter explained that there is a realm of scores that psychologists look at "[b]ecause we are human, we are providing the testing. And, you know, we have to say within a certain confidence level that this person's intelligence score fell in that realm."[2] With regard to why Appellant's IQ scores increased, Dr. Jeter said, "I think that [during the 2019 testing, Appellant] was not answering questions that he perceived as difficult. It's not atypical for adolescents, and it's certainly not atypical for youth who have had academic struggles. But it's just sometimes they don't want to put that energy in." Dr. Jeter further explained that Appellant's nonverbal score had increased thirty percent because "[h]e was not very motivated to our testing during [the 2019] test administration, which was discrepant from his evaluation in

---

[2]Dr. Jeter testified that it is her preference to give a range and that she has "a 90 percent confidence [level] that [Appellant's] true IQ falls within that range."

2018.[3]   And his scores in the 2018 evaluation were more similar to the 2020 evaluation."

The defense questioned why Dr. Jeter did not determine that Appellant was intellectually disabled in 2019 when his IQ was 68 and the 504 meeting from February 2018 had noted that he had exhibited physical or mental impairments that significantly impaired a major life activity.  Dr. Jeter agreed that the DSM criteria to find someone intellectually disabled is an IQ below 70 and impairment in life and onset before reaching adulthood, but she said that under her objective analysis, she did not find that Appellant was intellectually impaired or disabled in 2019 because she did not believe that was an accurate depiction of him.  She explained that when she had evaluated him in 2018, his score was higher; but in 2019, Appellant had exhibited a lack of motivation and had stopped answering questions early.

When asked whether she believed that Appellant's intellectual deficit, his inability to do schoolwork, and the fact that he was operating as a seven- or eight-year-old boy impacted her analysis of his maturity, Dr. Jeter responded, "I think he is as equally mature as other adolescents" even though his 2020 test results showed that he was in the below-average range of intelligence.

On redirect, Dr. Jeter agreed that the examinations produced a measure of an educational level, not a functional level.  Dr. Jeter testified that her findings were

---

[3]As a result of the 2018 testing, Dr. Jeter determined that Appellant's full-scale IQ was 76 and indicated that his true score fell between 70 and 84.

consistent with Appellant's lack of interest in education and with his learning differences. She explained that Appellant has some problems with learning (including diagnoses for dyslexia and ADHD), and "so that does impact his desire to be in school and struggle with that." Dr. Jeter had not observed deficits in Appellant's adaptive function and agreed that he was "even more sophisticated than the same age peers."

Dr. Jeter's conclusion in Appellant's October 2020 psychological evaluation is as follows:

> [Appellant] is not a person with mental retardation. He has a history of ADHD and currently[] appears to be experiencing anxiety related to his current legal situation. He is more sophisticated but not more mature than his same[-]aged peers. He appears capable of understanding the legal implications surrounding a discretionary transfer motion and of assisting his attorney in his defense. It appears [that] the[] community would be at a moderate to high level of risk were he to remain in it. [Appellant] would benefit from services afforded through the juvenile justice system[,] such as a high level of structure and supervision.

### 4. Other Testimony about Appellant's Maturity and Sophistication

Detective Barron said that he had testified at the prior transfer hearing that he believed during his investigation that there "was probably juvenile involvement . . . because of the lack of experience that you could honestly see." Detective Barron clarified, "I mean, it doesn't negate [Appellant's] ability to understand that what he was doing was wrong. It just means he either doesn't care about getting caught, or he hasn't done this enough times that he understands he might get caught doing it this

way." When asked whether he would admit that there was not much maturity or sophistication in the offense, Detective Barron answered, "I would say there's not a lot of maturity in it."

On redirect, Detective Barron testified that when he said that this offense did not show a lot of maturity, he meant maturity as a seasoned lifelong criminal, that is, the person who had robbed Gutierrez had not done it enough times to know that "this [entering by kicking in the door] is a bad idea." Detective Barron did not use the words sophisticated or mature to describe Appellant's behavior after the shooting but said that Appellant's getting rid of the gun and his clothes demonstrated that Appellant understood that what he did was wrong, that he needed to try to cover it, and that he knew how to cover it. In fact, Appellant was on his way to get rid of the magazine in his pocket when police stopped him; he had tried to sell it for $300.

Detective Barron did not have any reason to believe or any information that Appellant was intellectually impaired; instead, Detective Barron stated that Appellant had "seemed fine and functional" when he had spoken to Appellant. Appellant did not have any difficulty in understanding Detective Barron or in communicating with him. When asked whether Appellant was "able to articulate his thoughts[] and [was] able to communicate . . . in a sophisticated and mature manner," Detective Barron responded, "And in a manner enough so that he's even attempting to create a cover story . . . ."

During the two and a half years that probation officer Mitchell had known Appellant, he had not had any trouble communicating with him and had not noticed Appellant's having any difficulty communicating with others. Mitchell stated that during their interactions, nothing had led him to believe that Appellant is severely intellectually disabled. None of the documents from FWISD, MHMR, or the All Church Home specifically mentioned that Appellant has an intellectual disability.

When Mitchell testified at the first transfer hearing, he felt like there was still a possibility that Appellant could benefit from the juvenile system. At the second transfer hearing, Mitchell acknowledged that Appellant's options were no longer as broad as they were at the prior transfer hearing and that the only benefit that Appellant would have from staying in the juvenile system is that he might be able to spend a couple of years and get some education at TJJD.

### 5. Appellant's Mother's Testimony

Appellant's mother testified that she has three other children who reside with her in her apartment in Fort Worth. Appellant's mother noticed that when Appellant was in preschool, he struggled with tracing words and "just couldn't get it." Appellant's mother testified that teachers wanted to hold Appellant back in first grade, but she would not let them. Appellant was tested in third grade and was diagnosed as dyslexic. Later, he was diagnosed with ADHD and was prescribed medication around age ten.

Appellant's mother testified that the first 504 meeting was when Appellant was in third grade. The 504 plan was based on a combination of both behavior issues and learning issues but was based mainly on learning issues. Appellant's mother explained that his teachers believed that Appellant acted out because he was put on the spot to read and was embarrassed.

From 2014 to 2015, Appellant's mother was unemployed and homeless. CPS got involved, and Appellant and his brother lived in All Children's Home for about nine months.

Appellant's mother testified that when she was able to secure housing and get her children back, Appellant's "trouble started" because he met L.P. She explained that there was an incident when she could not find Appellant, and her brother went to L.P.'s house and found Appellant smoking marijuana.

Appellant's mother said that she has contact almost every day with Appellant in detention and that she had seen changes. She explained that his maturity had improved and that he seemed to be levelheaded.

Appellant's mother opined that he has some potential to turn around in five years, ten years, or twenty years. She asked the juvenile court to deny the certification so that Appellant's case could be handled in the juvenile court.

## 6.  Juvenile Court's Disposition

The juvenile court decided to waive its jurisdiction and transfer the case to a criminal court, explaining its reasoning from the bench:

> So, [Appellant], having heard and considered all of the competent evidence provided to this Court, and specifically, I've considered whether the offense was against persons o[r] property, the sophistication and maturity of you as a child, the record and previous history of you as a child, [and] the protection of the public[] and the likelihood of rehabilitation within the juvenile justice system.
>
> These are the four specific areas that I've considered, and I've considered everything presented to the Court.  This Court will waive jurisdiction of this matter and transfer to an adult criminal court.
>
> Okay.  [Appellant], a lot of this has to do with just when you break into somebody's house in the middle of the day, and then they die.  And it's just how serious this offense is, is really what's weighing on me.  I am considering everything.
>
> I am considering your history, any intellectual issues, all of those things.  But this is just too serious for a juvenile court to handle.  The legislature specifically allows certification for 14-year-olds for these types of offenses.  And so I think you deserve the respect and the courtesy of telling you why I'm making the decision that I'm making.

The juvenile court also issued a written order granting the transfer:

> Having heard and considered the evidence, the arguments of counsel for both parties, and all matters required by Texas Family Code Section 54.02, the Court makes the following FINDINGS:
>
> The Court finds that [Appellant] is a male person who was born on November [X], 2003, and that [Appellant] was 14 years of age at the time the acts upon which the First Amended Petition is founded are alleged to have occurred.
>
> The Court finds that [Appellant] was 17 years of age on the date of this hearing.

22

. . . .

The Court finds that no adjudication hearing has been conducted concerning the acts alleged in the First Amended Petition.

The Court finds that, prior to this hearing, the Court ordered and obtained a complete diagnostic study, social evaluation, and full investigation of [Appellant], his circumstances, and the circumstances of the alleged offenses.

The Court finds that the acts alleged in Paragraphs III and IV of the First Amended Petition [setting forth the offenses of capital murder and aggravated robbery], if committed by an adult, are felonies under the penal laws of the State of Texas, specifically a capital felony and a felony of the first degree.

The Court finds that the offenses alleged in . . . Paragraphs III and IV of the First Amended Petition were committed against the person of another and that there is probable cause to believe that [Appellant] committed said offenses.

The Court finds that [Appellant] is of sufficient sophistication and maturity to be tried as an adult, having considered all the evidence, exhibits, reports, and testimony adduced during the hearing, and the following:

(1)     testimony and reports from licensed psychologist Dr. Jeter, who examined [Appellant] and conducted IQ tests in 2018, 2019, and 2020 and concluded from her multiple examinations that [Appellant] is not a person with an intellectual disability, that [Appellant] is as mature as other 17 year old males and is more sophisticated than other 17 year old males, and that [Appellant] is capable of understanding the legal implications surrounding a discretionary transfer hearing and of assisting his attorney in his defense;

(2)     testimony from juvenile probation officer Ronnie Mitchell, who had extensive contact with [Appellant] in 2018, 2019, and 2020, that [Appellant] was able to communicate with him appropriately[,] and that he did not observe any

23

difficulty in communicating or indication of intellectual disability on the part of [Appellant] during his personal interactions with [Appellant]; and

(3) the facts of the offenses themselves, including [Appellant's] carrying out a collaborative scheme, obtaining and carrying a loaded handgun, looking for a crime to commit, kicking in an apartment door in broad daylight, entering the apartment, pointing the loaded handgun at the victim and demanding and obtaining her property, shooting and killing the victim, disposing of the stolen property, disposing of the clothing [Appellant] wore during the offense, and attempting to dispose of the handgun used to shoot the victim.

The Court considered [Appellant's] record and previous history[] and finds that it is extensive and includes prior referrals to Tarrant County Juvenile Services for the offenses of:

(1) Terroristic Threat;
(2) Burglary of a Habitation;
(3) Criminal Trespass;
(4) Possession of Mari[j]uana;
(5) Burglary of a Building;
(6) Possession of Mari[j]uana; and
(7) Criminal Trespass.

The Court finds that the prospects of adequate protection of the public and the likelihood of the rehabilitation of [Appellant] by use of procedures, services, and facilities currently available to the juvenile court are low, having considered all of the evidence and the following items:

(1) [Appellant], prior to committing the offenses made the subject of this cause, received supervision and services from Tarrant County Juvenile Services (the local juvenile probation department) without success;
(2) [Appellant] was on felony juvenile probation at the time he is alleged to have committed the offenses made the subject of this cause;

24

(3)     [Appellant] is alleged to have committed other law violations during the term of his felony probation;

(4)     [Appellant] failed to appear at a juvenile court hearing scheduled for the date of the offenses alleged in this cause;

(5)     while under juvenile probation supervision, [Appellant] was often truant from school[] and regularly broke curfew;

(6)     [Appellant] is a documented member of a criminal street gang;

(7)     the instant offenses involve the use of deadly force against an unarmed and cooperative mother in her own home; and

(8)     [Appellant] is now 17 years and one month old[,] and[] even with a determinate sentence, [Appellant] can only receive services from either the local juvenile probation department or from the Texas Juvenile Justice Department for a period of 23 months or less.

In consideration of all the above evidence and the statutory factors, the Court finds that, because of the seriousness of the offenses alleged in the First Amended Petition, the welfare of the community requires criminal proceedings.

THEREFORE, by reason of the foregoing, I . . . hereby waive this Court's exclusive original jurisdiction of the matters made the subject of this cause and transfer [Appellant] . . . to the appropriate district court or criminal district court of Tarrant County, Texas, for criminal proceedings, and do hereby certify said action.

## D.     Postjudgment Proceedings

Appellant filed a motion for new trial and an amended motion for new trial in which he challenged the admission of the October 2020 psychological evaluation and raised various as-applied and facial constitutional challenges to Texas Family Code Section 54.02. The State filed a response. The juvenile court held a hearing on the motion and denied it. Appellant timely perfected this appeal.

25

### III.  Double Jeopardy[4]

In his fourth point, Appellant argues that the second transfer hearing was barred by double jeopardy and by the principle of collateral estoppel.  Appellant relies on a case from the First Court of Appeals that includes a statement limiting the juvenile court's ability to make a second certification solely to instances when a case is remanded due to an insufficient order.  *See In re J.G.*, 495 S.W.3d 354, 365–66 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).  Because *J.G.* fails to discuss when jeopardy attaches, we instead look to a case from the San Antonio Court of Appeals holding that jeopardy does not attach to a transfer hearing, and thus a second transfer hearing is not barred by the Double Jeopardy Clause.  *See In re M.A.V.*, 88 S.W.3d 327, 329–30 (Tex. App.—San Antonio 2002, no pet.).

In *M.A.V.*, the San Antonio Court of Appeals distinguished a United States Supreme Court case in which a juvenile was adjudicated prior to transfer and explained that jeopardy attaches to an adjudication, not a transfer hearing:

> In his first issue, M.A.V. claims the juvenile court is precluded from transferring him to criminal district court because jeopardy has already attached regarding the alleged offenses.  *See Breed v. Jones*, 421 U.S. 519, 95 S. Ct. 1779[] . . . (1975).  M.A.V. contends jeopardy has attached because the court's transfer order states:  "the court finds . . . [M.A.V.]

---

[4]We first address Appellant's fourth and second points that allege violations of his constitutional rights and his third point challenging the constitutionality of Section 54.02(c) because, if successful, they would afford the greatest relief—a remand to the juvenile court for proceedings without the application of the challenged transfer provision.  *See A.K.*, 2020 WL 1646899, at *5 (citing *In re B.G.*, 317 S.W.3d 250, 258 (Tex. 2010)).  We then address his first point challenging the sufficiency of the evidence to support the transfer order.

did violate a penal law . . . [] (the order then cites each penal provision M.A.V. purportedly violated)." We disagree.

In *Breed v. Jones*, the State of California filed a petition in juvenile court alleging [that] Breed had committed robbery. *Id.* at 521, 95 S. Ct. [at 1781]. An adjudicatory hearing was held, and the court determined Breed had committed the offense. *Id.* at 521–22, 95 S. Ct. [at 1782]. Shortly thereafter, the court declared Breed "unfit for treatment as a juvenile" and transferred Breed to adult court. *Id.* at 524, 95 S. Ct. [at 1783]. Breed was tried as an adult and, once again, found guilty of robbery. *Id.* at 525, 95 S. Ct. [at 1783]. Breed filed a petition for a writ of habeas corpus in federal district court, alleging [that] his prosecution in adult court subjected him to double jeopardy. *Id.* at 525–26, 95 S. Ct. [at 1783–84]. The Supreme Court agreed with Breed, holding [that] jeopardy attaches[]

> at a proceeding whose object is to determine whether he has committed acts that violate a criminal law and whose potential consequences include both the stigma inherent in such a determination and the deprivation of liberty for many years.

*Id.* at 529, 95 S. Ct. [at 1785]. The Court determined jeopardy attaches at the point in a juvenile proceeding where the juvenile is "put to trial before the trier of facts." *Id.* at 531, 95 S. Ct. [at 1787]. The [C]ourt recognized its holding will require that a decision to transfer a juvenile be made prior to an adjudicatory hearing. *Id.* at 535–36, 95 S. Ct. [at 1789]. However, the Court specifically noted[] [that]

> nothing decided today forecloses [s]tates from requiring as a prerequisite to the transfer of a juvenile, substantial evidence that he committed the offense charged, so long as the showing required is not made in an adjudicatory proceeding.

*Id.* at 538 n.[]18, 95 S. Ct. [at 1790 n.18].

*Breed* is distinguishable from the case at bar. Unlike *Breed*, we are not confronted with a situation where the child was adjudicated prior to his transfer. Texas courts have consistently held that a certification and transfer hearing is not an adjudicatory trial because the child's guilt or

innocence is not the subject of inquiry.  *In re L.R.L.C.*, 693 S.W.2d 552, 553 (Tex. App.—San Antonio 1985, no writ).  Rather, the subject of inquiry at such hearing is whether[]

> there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the offense alleged or the background of the child[,] the welfare of the community requires criminal proceedings.

*See* Tex. Fam. Code Ann. § 54.02(a)(3)[.]

> It is clear from the record that Judge Mireles knew the difference between transfer and adjudication, and conducted the proceeding as a transfer hearing. . . .
>
> . . . .
>
> Because Judge Mireles recognized that the only issue to be decided at this hearing was whether he should transfer M.A.V. to criminal district court, we hold M.A.V.'s double jeopardy rights were not violated.

*Id.* at 329–30.  We agree with the San Antonio court's reasoning and reach the same conclusion here.

Because the first transfer hearing did not involve an adjudication,[5] jeopardy did not attach.  And because jeopardy did not attach, collateral estoppel did not come into

---

[5]The reporter's record from the first transfer hearing was admitted during the second transfer hearing.  At the outset of the first transfer hearing, the juvenile court noted that there had not been an adjudication, and before waiving its jurisdiction, the juvenile court stated that

> this is a process to decide whether I'm going to waive my jurisdiction. The result of this hearing is not about whether you did this offense or not.  It's simply about whether . . . the juvenile justice system is adequately equipped to handle your case or you're better equipped in the

play to bar a subsequent certification hearing. *See York v. State*, 342 S.W.3d 528, 551 (Tex. Crim. App. 2011) ("If jeopardy does not attach to a particular issue in the first prosecution, then that issue cannot become the basis for collateral estoppel in a subsequent prosecution."); *Adames v. State*, No. 13-15-00569-CR, 2018 WL 5074696, at *3 (Tex. App.—Corpus Christi–Edinburg Oct. 18, 2018, no pet.) (mem. op., not designated for publication) ("Thus, for collateral estoppel to apply on a constitutional basis, jeopardy must have attached[,] or there must have been the equivalent of criminal punishment in the first proceeding.").

Accordingly, we hold that the second transfer hearing was not barred by double jeopardy or by collateral estoppel, and we overrule Appellant's fourth point.

## IV. Cruel and Unusual Punishment

In his second point, Appellant argues that it was a violation of the constitutional prohibition against cruel and unusual punishment and manifestly unjust to transfer him—an "intellectually disabled/deficient juvenile"—to criminal court. Appellant bases his argument on the Eighth and Fourteenth Amendments to the United States Constitution; Article I, Section 13 of the Texas Constitution;[6] and the

---

adult justice system. And so things that are said here, while some of it may be admissible in your own trial, this entire proceeding today will not be admissible as a whole in your trial.

The juvenile court thus made clear that no adjudication had occurred.

[6]Appellant includes only one sentence in his brief about the cruel-and-unusual-punishment provision contained in the Texas Constitution: "Article 1, Section 13 of

"guarantee of fundamental fairness" as set forth in *Moon*. *See* U.S. Const. amend. VIII, XIV; Tex. Const. art. I, § 13; *Moon v. State*, 451 S.W.3d 28, 51 (Tex. Crim. App. 2014), *overruled by Ex parte Thomas*, No. WR-89,128-01, 2021 WL 1204352 (Tex. Crim. App. Mar. 31, 2021). Appellant's argument is centered on a faulty premise, as he has not been determined to be intellectually disabled.

Moreover, Appellant recognizes that we analyzed his cruel-and-unusual-punishment point in our prior opinion[7] and that we concluded that "a cruel[-]and[-]unusual[-]punishment claim cannot be maintained because [Section] 54.02 is not a punishment provision." Appellant responds that "[o]ther courts have taken a broader interpretation of the scope of a cruel[-]and[-]unusual[-]punishment protection" and that his transfer under Section 54.02 "calls for a new review in light of the legal trends developing in this area of disability and juvenile law."

Of the cases that Appellant cites to support his legal-trend argument, only one was issued after our prior opinion, and it does not address Section 54.02. *See Avalos v. State*, 616 S.W.3d 207, 211 (Tex. App.—San Antonio 2020, pet. granted) (op. on

---

the Texas Constitution contains an identical provision [to the Eighth Amendment of the United States Constitution]." Appellant does not, however, argue that the Texas Constitution provides greater protections than the Eighth Amendment. Thus, we will analyze his cruel-and-unusual-punishment claim solely on federal grounds. *See Murphy v. State*, 112 S.W.3d 592, 607 (Tex. Crim. App. 2003); *Muniz v. State*, 851 S.W.2d 238, 251–52 (Tex. Crim. App. 1993) (holding that failure to provide a rationale for interpreting state constitution more broadly than federal constitution and failure to provide separate substantive analysis for state ground forfeits state ground); *A.K.*, 2020 WL 1646899, at *7.

[7] *See A.K.*, 2020 WL 1646899, at *7–8.

en banc reconsideration) (holding that Texas Penal Code Section 12.31(a)(2), which automatically imposes life imprisonment without parole, is unconstitutional as applied to intellectually disabled persons). In its most recent pronouncement, the United States Supreme Court refused to impose additional structures on a court's discretion to impose a sentence of life without parole on a murderer who committed the crime when less than 18 years of age. *See Jones v. Mississippi*, No. 18-1259, slip op. at 14, 22 (U.S. S. Ct. Apr. 22, 2021), https://www.supremecourt.gov/opinions/20pdf/18-1259_8njq.pdf. Because Appellant has not raised anything new for our review, we decline to re-analyze his cruel-and-unusual-punishment argument. We therefore overrule Appellant's second point.

## V. Rights under the Fifth, Sixth, and Fourteenth Amendments

In his third point, Appellant argues that Texas Family Code Section 54.02(c)[8] is unconstitutional on its face and as applied to him because it violates the guarantees of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 10, 15, and 19 of the Texas Constitution.[9] *See* U.S. Const. amend.

---

[8]Appellant is not consistent in his third point about whether he is challenging solely Subsection (c) or Section 54.02 generally. We have attempted to track the arguments that he makes within his third point.

[9]Appellant's third point includes only one sentence about the difference between the Texas Constitution and the federal constitution: "While the Texas Constitution is textually different [from the federal constitution] in that it refers to 'due course' rather than 'due process[,]' we regard these items as without meaningful distinction." Appellant does not, however, argue that the Texas Constitution provides greater protections than the federal constitution. Thus, we will analyze his

31

V, VI, XIV; Tex. Const. art. I, §§ 10, 15, 19.  Specifically, Appellant contends that

Section 54.02(c) violates his right to confrontation, right to a jury trial, "right" to the

rules of evidence, right against self-incrimination, and right to due process.

## A.    Applicable Law

We set forth the law applicable to constitutional challenges to a statute in our

prior opinion as follows:

> Statutes are presumed to be constitutional.  *Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex. 1983); . . . *J.G.*, 495 S.W.3d [at] 364 . . . ; *see also Peraza v. State*, 467 S.W.3d 508, 514 (Tex. Crim. App. 2015).  A party challenging the constitutionality of a statute bears the burden of rebutting the presumption.  *Peraza*, 467 S.W.3d at 514; *J.G.*, 495 S.W.3d at 364–65. We endeavor to uphold the statute, "mak[ing] every reasonable presumption in favor of the statute's constitutionality, unless the contrary is clearly shown."  *Peraza*, 467 S.W.3d at 514; *see J.G.*, 495 S.W.3d at 365.

> When a party challenges the constitutionality of a statute on its face, it attacks the statute, not just a particular application of it, and must show that "no set of circumstances exists under which [the] statute would be valid."  *Peraza*, 467 S.W.3d at 514.  If the statute could be valid in any circumstance, the facial challenge fails.  *Id.* at 515–16.  Because of this high burden, a facial challenge rarely succeeds.  *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987); *Allen v. State*, [614 S.W.3d 736, 741] (Tex. Crim. App. [] 2019).

> When a party brings an as-applied challenge to a statute's constitutionality, the party claims that the statute, "although generally constitutional, operates unconstitutionally as to the claimant because of his particular circumstances."  *Faust v. State*, 491 S.W.3d 733, 743–44 (Tex. Crim. App. 2015) (footnote omitted); *see In re A.J.F.*, 588 S.W.3d 322, 339 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

---

constitutional challenges to Section 54.02(c) solely on federal grounds.  *See Murphy*, 112 S.W.3d at 607; *Muniz*, 851 S.W.2d at 251–52; *A.K.*, 2020 WL 1646899, at *7.

*A.K.*, 2020 WL 1646899, at *6.

## B.  Challenged Statute

The statute that Appellant challenges is Texas Family Code Section 54.02(c), which states that "[t]he juvenile court shall conduct a hearing without a jury to consider transfer of the child for criminal proceedings." *See* Tex. Fam. Code Ann. § 54.02(c).

## C.  Analysis of As-Applied Challenge[10]

### 1.  Right to Confrontation

Appellant's first as-applied argument challenges Section 54.02(c) on the ground that it does not afford a juvenile at a transfer hearing the right to confront the witnesses against him.  Appellant, however, acknowledges that we have previously held that Section 54.02 contains a statutory exception to the hearsay rule and authorizes the introduction of specific reports that would otherwise be objectionable.

---

[10]The State argued in its response to Appellant's amended motion for new trial that Appellant had failed to raise his as-applied challenge during the transfer hearing. An as-applied challenge must be raised in the trial court, but it need not be raised during the transfer hearing. *See generally Gillenwaters v. State*, 205 S.W.3d 534, 538 (Tex. Crim. App. 2006) (holding that appellant's motion for new trial was sufficient under Rule 33.1 to preserve for appellate consideration his "unconstitutionally vague as applied" challenge to telephone harassment statute). Because Appellant raised all of his as-applied challenges, except for the one he labels as his "right to the rules of evidence," in his timely amended motion for new trial and obtained a ruling on the motion, we hold that other than that one exception, Appellant preserved his as-applied challenges to Section 54.02. *See id.*; *see also In re O.R.F.*, 417 S.W.3d 24, 44 (Tex. App.—Texarkana 2013, pet. denied) (mem. op. on reh'g) (assuming that appellant had preserved her as-applied challenge by raising it for the first time in her motion for new trial even though she could have raised her complaint at any point prior to the judgment).

*See In re Q.D.*, 600 S.W.2d 392, 394 (Tex. App.—Fort Worth 1980, no writ) (stating that because Section 54.02(d) requires the juvenile court to obtain a prediagnostic study and because Section 54.02(e) allows the juvenile court to consider this study in addition to other testimony, Section 54.02 is a statutory exception to the hearsay rule and authorizes the introduction of specified reports that would otherwise be objectionable). More recently, we have stated that "[t]his court[] . . . has repeatedly held that a juvenile has no right of confrontation at a discretionary transfer hearing." *In re H.C.*, No. 02-15-00149-CV, 2016 WL 354297, at *1 & n.3 (Tex. App.—Fort Worth Jan. 28, 2016, no pet.) (mem. op.) (collecting cases). Alternatively, the record reflects that Appellant had the opportunity to cross-examine Dr. Jeter who prepared the psychological evaluation and the probation officer who prepared the prediagnostic study. Because there is no right of confrontation at a transfer hearing and, alternatively, because Appellant was able to question the witnesses who prepared the reports that were admitted into evidence, we overrule the portion of Appellant's third point challenging Section 54.02(c) as applied to him on the confrontation ground.

### 2.    Right to a Jury Trial

Appellant's second as-applied argument is that "[t]he Legislature has specifically provided in Section 54.02(c) that all transfer hearings shall be without a jury" and that "[t]he denial of a jury at this critical stage of the juvenile's prosecution violates his basic Sixth Amendment right." We held in the prior appeal that "Section 54.02 as applied to Appellant did not violate his rights to a jury trial [as] guaranteed by the

Sixth and Fourteenth Amendments." *See A.K.*, 2020 WL 1646899, at *9 (citing *Rivera v. State*, Nos. 05-06-00026-CR, 05-06-00027-CR, 2007 WL 3245610, at *4 (Tex. App.—Dallas Nov. 5, 2007, no pet.) (not designated for publication)). Appellant raises no new law on appeal that would necessitate our revisiting this argument. We therefore overrule this portion of Appellant's third point.

### 3.  "Right to the Rules of Evidence"

Appellant's third as-applied argument appears to challenge Section 54.02(c) on the ground that it violates his "right to the rules of evidence," though he does not cite any statutory or constitutional provision for the basis of his alleged "right" and does not specify any evidence at the transfer hearing for which he sought and was denied a ruling on its admissibility. Appellant states that "more than one Texas court has held that a juvenile court is not required to rule on the admissibility of evidence during a transfer hearing."[11] Unlike the First Court of Appeals, this court has not taken a stance on the issue but has resolved a case by assuming that the rules of evidence

---

[11]Although Appellant states "more than one Texas court," he cites two cases from the same court. *See Navarro v. State*, Nos. 01-11-00139-CR, 01-11-00140-CR, 2012 WL 3776372, at *6 (Tex. App.—Houston [1st Dist.] Aug. 30, 2012, pet. ref'd) (mem. op., not designated for publication) (holding that juvenile court is not required to rule on the admissibility of evidence during a transfer hearing); *see also In re H.Y.*, 512 S.W.3d 467, 474 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (referencing *Navarro* but stating that it "need not resolve whether the Rules of Evidence . . . apply to juvenile transfer hearings pursuant to [S]ection 51.17(c), because even if we were to reach this claim, it would not result in reversal of the juvenile court's order in this case" as the evidence was cumulative of other evidence that was admitted without objection).

apply to a transfer hearing. *See In re D.S.*, No. 02-17-00050-CV, 2017 WL 3187021, at *5 (Tex. App.—Fort Worth July 27, 2017, pet. denied) (mem. op.).

Here, we do not reach the issue of whether the rules of evidence apply to a transfer hearing because Appellant did not raise this ground in his amended motion for new trial. Appellant has therefore forfeited this as-applied challenge to Section 54.02(c). *See Sigalavillavicencio v. State*, No. 02-17-00244-CR, 2019 WL 311515, at *2 (Tex. App.—Fort Worth Jan. 24, 2019, pet. ref'd) (mem. op., not designated for publication) (citing *Curry v. State*, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995), and holding that as-applied issues were forfeited because they were not raised in the trial court). Accordingly, we overrule this portion of Appellant's third point.

### 4. Right Against Self-Incrimination

Appellant's fourth as-applied argument is that the transfer provisions of Section 54.02(f) do not afford him the right against self-incrimination like a detention hearing does. *See generally* Tex. Fam. Code Ann. § 54.01(g) ("No statement made by the child at the detention hearing shall be admissible against the child at any other hearing."). Specifically, Appellant argues that

> [i]t is significant that the rights afforded at a mere detention hearing are denied at the most critical proceeding a juvenile will face. It is an imbalance of the system and unjust for the State to be unfettered from the common law and constitutional rules of practice while the juvenile is unable to speak in his own behalf without incriminating himself at the juvenile's last appearance in juvenile court.

36

The Texas Court of Criminal Appeals has explained the general scope of the Fifth Amendment as follows:

> The scope of the Fifth Amendment is comprehensive, protecting the individual not only against being involuntarily called as a witness against himself in a criminal prosecution, but also permitting him "not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."

*In re Medina*, 475 S.W.3d 291, 299 (Tex. Crim. App. 2015) (orig. proceeding) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S. Ct. 316, 322 (1973)).

Here, Appellant's as-applied argument that is centered on an alleged violation of his right against self-incrimination under the Fifth Amendment is purely hypothetical. Appellant does not say how his Fifth Amendment rights were violated; he does not argue that he was compelled to testify,[12] nor does he argue that his silence was used against him.

To the extent that Appellant's argument can be broadly construed as challenging his participation in the psychological evaluation, that argument also fails. The Texas Court of Criminal Appeals has discussed the application of the Fifth Amendment, as well as the Sixth Amendment, to psychological evaluations and found no violation when the exam did not exceed its intended purpose—assisting the juvenile court in assessing the Section 54.02(f) factors—and was limited to the transfer determination:

---

[12]At the hearing on Appellant's motion for new trial, defense counsel argued, "Basically *if* he testifies[,] it can be used against him." [Emphasis added.]

In light of the criteria a juvenile court is required to consider in making its determination on transfer, we recognize that it is all but inevitable, that in the course of any psychiatric or psychological examination, the doctor will inquire into the facts of the alleged offense and the juvenile[]'s prior criminal experiences. *See* Tex. Fam. Code [Ann.] § 54.02(d)[,] (f). Such a query is permissible so long as it is not intended to force juveniles to supply incriminating evidence or investigative leads against themselves. Failure to limit the query to its permissible purpose could lead to a violation of a juvenile's right against self-incrimination or right to counsel.

Though the psychological report in this case contained information concerning appellant's previous delinquency and criminal conduct, as well as a summary of the doctor's conversation with appellant regarding the offense alleged and his prior delinquent conduct, we cannot say the exam exceeded its intended purpose. Because appellant was forced to supply neither incriminating evidence nor investigative leads, we do not agree with appellant's contention that the exam amounted to a custodial interrogation entitling him to Fifth and Sixth Amendment protections. Furthermore, because the State's use of the information elicited from the exam was limited to the transfer determination, we find no constitutional violations consistent with *Estelle* [*v. Smith*, 451 U.S. 454, 101 S. Ct. 1866 (1981),] or *Satterwhite* [*v. Texas*, 486 U.S. 249, 108 S. Ct. 1792 (1988)].

*Hidalgo v. State*, 983 S.W.2d 746, 754, 756 (Tex. Crim. App. 1999) (footnote omitted).

Here, Appellant does not argue, and the record does not reflect, that Dr. Jeter sought to elicit incriminating evidence or investigative leads when she conducted Appellant's psychological evaluations. The psychological evaluations did not exceed their limited purpose of assisting the juvenile court in assessing the Section 54.02(f) factors and the State's use of the information elicited from the evaluations was limited solely to the transfer determination. *See, e.g.*, *C.J.P. v. State*, 650 S.W.2d 465, 466–67 (Tex. App.—Houston [14th Dist.] 1983, no writ) (stating that because the proceeding in which a

juvenile court decides whether it waives its exclusive original jurisdiction and transfers the child to an appropriate criminal district court is not an adjudication of the child's guilt or innocence, unlike a detention hearing, the child's Fifth Amendment rights are not in issue); *cf. In re N.B.*, No. 03-97-00766-CV, 1999 WL 214881, at *1 (Tex. App.—Austin Apr. 15, 1999, no pet.) (not designated for publication) (collecting cases in which courts rejected appellants' complaints that admission of the prediagnostic study violated their Fifth Amendment privilege against self-incrimination).

Accordingly, we hold that Appellant has not shown that Section 54.02 as applied to him violated his right against self-incrimination. We overrule the portion of Appellant's third point as to his right against self-incrimination.

### 5.    Right to Due Process

Appellant's final as-applied argument is that the due process required by Section 54.02(f)[13] is "rolled back" by *Moon*'s holding that any combination of these factors may suffice to support a waiver of jurisdiction. *See Moon*, 451 S.W.3d at 47 n.78. *But see Thomas*, 2021 WL 1204352, at *6 (explicitly overruling *Moon*). Appellant further argues that "[i]f the transfer hearing is a critically important proceeding[,] then the full protection of due process should be applied." We set forth the following discussion in our prior opinion:

---

[13]Texas Family Code Section 54.02(f) sets forth the four factors that the juvenile court shall consider in making a transfer decision. *See* Tex. Fam. Code Ann. § 54.02(f). We do not further elaborate on the factors here because they are not necessary for the disposition of Appellant's final as-applied argument.

In *Kent v. United States*, the Supreme Court held that the transfer "hearing must measure up to the essentials of due process and fair treatment." 383 U.S. 541, 562, 86 S. Ct. 1045, 1057 (1966). Due process mandates "a hearing, including access to the social records and probation or similar reports which presumably are considered by the court, and . . . a statement of reasons for the Juvenile Court's decision." *Id.* at 557, 86 S. Ct. at 1055; *J.G.*, 495 S.W.3d at 367 (quoting same in Section 54.02(j) case). A transfer hearing was held in this case, Appellant does not argue that he lacked access to the documentary evidence considered by the court, and the order states some reasons for the decision. We therefore hold that Appellant received due process under the statute.

*A.K.*, 2020 WL 1646899, at *8. Because we have previously decided Appellant's due process argument and because Appellant has not presented anything new for our review, we overrule the due process portion of Appellant's third point.

### D. Facial Analysis[14]

Appellant's third point also includes a facial challenge to Section 54.02(c). Appellant argues that "[t]his statute at every step of the way strips the juvenile of every common law and constitutional protection usually afforded in a court of law." Appellant's argument is grounded on the premise that juveniles are entitled at a transfer hearing to all of the common law and constitutional protections of a criminal trial that are set forth above—even though such protections are not triggered at a

---

[14]Although Appellant raised a facial challenge to Section 54.02 in his prior appeal, we did not fully delve into that challenge because Appellant waived his on-its-face constitutional challenge to Section 54.02(c) at oral argument in that appeal. *See A.K.*, 2020 WL 1646899, at *7.

40

pretrial proceeding at which guilt–innocence is not at issue[15]—and that a statute that does not provide such protections is automatically unconstitutional. We disagree.

We noted in the prior appeal that "Section 54.02(c)'s failure to require that a jury determine whether to transfer a juvenile to a criminal court does not make it unconstitutional on its face." *Id.* at *9 (citing *State v. Lopez*, 196 S.W.3d 872, 875 (Tex. App.—Dallas 2006, pet. ref'd)). We similarly hold that the fact that Section 54.02(c) does not trigger the right to confront witnesses or the right against self-incrimination and that Section 54.02(e) provides an exception to the hearsay rule does not make the statute unconstitutional on its face. When we consider actual application of the statute to juveniles (excluding those who fall under Subsection (j), which is not challenged on appeal and does not apply to Appellant), there are possible constitutional applications of the statute: all juveniles receive a hearing that affords due process, and the statute does not allow certain categories of juveniles to be treated differently than others (i.e., some are allowed the right to confront witnesses, the right to a jury trial, or the right against self-incrimination). Thus, Appellant has not met his burden to show that there are no possible constitutional applications of the statute. *See id.* at *6 (citing *Peraza*, 467 S.W.3d at 514); *cf. Ex parte Moon*, No. 01-18-01014-CR, 2020 WL 827424, at *11 (Tex. App.—Houston [1st Dist.] Feb. 20, 2020, no pet.) (holding that Section 54.02(j) is not facially unconstitutional under all possible

---

[15]Having held that Appellant received due process under the statute, we exclude his due process argument as a basis for his facial challenge to Section 54.02.

41

circumstances because it validly applies to individuals who initially enter the juvenile system when they are over eighteen years of age). Accordingly, we overrule the remainder of Appellant's third point.

## VI. Sufficiency of the Evidence to Support the Transfer Order

In his first point, Appellant argues that there is insufficient evidence to support the transfer order. Appellant contends that no new relevant or probative evidence was introduced at the second hearing that would cause this court to reach a different conclusion than the one in the prior appeal regarding his sophistication and maturity. Because the focus of Appellant's argument is our prior decision that the evidence was factually insufficient and that evidence at the second hearing did not change that, we construe his argument in this appeal as limited solely to a factual-sufficiency challenge of the sophistication-and-maturity factor.

### A.      Standard of Review

Our review of a transfer order is two pronged. First, we review the juvenile court's specific findings of fact regarding the Section 54.02(f) factors under "traditional sufficiency of the evidence review." *See In re C.M.M.*, 503 S.W.3d 692, 701 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Under a factual sufficiency challenge, we consider all the evidence presented to determine if the juvenile court's findings are against the great weight and preponderance of the evidence so as to be clearly wrong and unjust. *Id.*

Second, we review the juvenile court's waiver decision for an abuse of discretion. *Id.* That is, in deciding whether the juvenile court erred to conclude that the seriousness of the offense alleged or the background of the juvenile or both called for criminal proceedings for the welfare of the community, we simply ask, in light of our own analysis of the sufficiency of the evidence to support the Section 54.02(f) factors and any other relevant evidence, whether the juvenile court acted without reference to guiding rules or principles. *Id.* A juvenile court abuses its discretion when its transfer decision is essentially arbitrary, given the evidence upon which it was based. *Id.* By contrast, a waiver decision representing "a reasonably principled application of the legislative criteria" generally will pass muster under this standard of review. *Id.*

## B.    Applicable Law

The statutory requirements for waiver of jurisdiction and transfer are as follows:

(1) the child is alleged to have violated a penal law of the grade of felony;

(2) the child was:

> (A) 14 years of age or older at the time [of the alleged offense], if the offense is a capital felony . . . , and no adjudication hearing has been conducted concerning that offense; [and]
>
> . . . .
>
> (3) after a full investigation and a hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness of the

43

offense alleged or the background of the child [or both] the welfare of the community requires criminal proceedings.

Tex. Fam. Code Ann. § 54.02(a); *see id.* § 51.02(2) (defining "child" as "a person who is . . . ten years of age or older and under 17 years of age"). The State has the burden to persuade the juvenile court by a preponderance of the evidence that the welfare of the community requires transfer of jurisdiction for criminal proceedings, either because of the seriousness of the offense or the background of the child (or both). *In re K.W.*, No. 02-19-00323-CV, 2020 WL 98144, at *3 (Tex. App.—Fort Worth Jan. 9, 2020, no pet.) (mem. op.).

In making the determination required by Section 54.02(a)(3), the juvenile court shall consider, among other matters, the following:

(1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

(2) the sophistication and maturity of the child;

(3) the record and previous history of the child; and

(4) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

*See* Tex. Fam. Code Ann. § 54.02(f). These are nonexclusive factors that serve to facilitate the juvenile court's balancing of "the potential danger to the public" posed by the juvenile offender with his "amenability to treatment." *In re J.R.*, No. 05-20-00920-CV, 2021 WL 777090, at *6 (Tex. App.—Dallas Mar. 1, 2021, no pet. h.) (mem. op.) (quoting *Hidalgo*, 983 S.W.2d at 754). Any combination of these criteria

44

may suffice to support a waiver of jurisdiction; not every criterion need weigh in favor of transfer. *K.W.*, 2020 WL 98144, at *3. "The [juvenile] court is bound only to consider these . . . factors in deciding whether to waive jurisdiction. The court need not find that each factor is established by the evidence." *Id.* at *4 (quoting *In re D.L.N.*, 930 S.W.2d 253, 258 (Tex. App.—Houston [14th Dist.] 1996, no writ)). "A juvenile transfer order entered after the required transfer hearing and complying with the statutory requirements constitutes a valid waiver of jurisdiction even if the transfer order does not contain factually-supported, case-specific findings." *Thomas*, 2021 WL 1204352, at *9.

## C. Analysis

We begin our analysis of the sufficiency of the evidence to support the juvenile court's sophistication-and-maturity finding by noting that the purpose of an inquiry into the mental ability and maturity of the juvenile is to determine whether he appreciates the nature and effect of his voluntary actions and whether they were right or wrong. *See J.R.*, 2021 WL 777090, at *8. In its written order, the juvenile court found that Appellant "is of sufficient sophistication and maturity to be tried as an adult." The juvenile court based its decision regarding the sophistication-and-maturity factor on the following:

> (1)    testimony and reports from licensed psychologist Dr. Jeter, who examined [Appellant] and conducted IQ tests in 2018, 2019, and 2020 and concluded from her multiple examinations that [Appellant] is not a person with an intellectual disability, that [Appellant] is as mature as other 17[-]year[-]old males and is more

45

sophisticated than other 17[-]year[-]old males, and that [Appellant] is capable of understanding the legal implications surrounding a discretionary transfer hearing and of assisting his attorney in his defense;

(2)     testimony from juvenile probation officer Ronnie Mitchell, who had extensive contact with [Appellant] in 2018, 2019, and 2020, that [Appellant] was able to communicate with him appropriately and that he did not observe any difficulty in communicating or indication of intellectual disability on the part of [Appellant] during his personal interactions with [Appellant]; and

(3)     the facts of the offenses themselves, including [Appellant's] carrying out a collaborative scheme, obtaining and carrying a loaded handgun, looking for a crime to commit, kicking in an apartment door in broad daylight, entering the apartment, pointing the loaded handgun at the victim and demanding and obtaining her property, shooting and killing the victim, disposing of the stolen property, disposing of the clothing [Appellant] wore during the offense, and attempting to dispose of the handgun used to shoot the victim.

As noted in the written order, the juvenile court specified the facts that it used from Dr. Jeter's testimony[16] and report and Mitchell's testimony in order to make its sophistication-and-maturity finding. Appellant does not attack Mitchell's testimony but contends that the October 2020 psychological evaluation and Dr. Jeter's testimony "added a new layer of unsupported opinion to the record," and he questions whether a new psychological evaluation should have even been performed.[17]  Appellant does not, however, challenge Dr. Jeter's credentials as an

---

[16]Dr. Jeter did not testify at the initial transfer hearing.

[17]Appellant's brief mentions Rule 403 as one objection that he raised at trial in an attempt to keep out the 2020 psychological examination. *See* Tex. R. Evid. 403.

46

expert who can perform such psychological evaluations and interpret the results of IQ testing.

The applicable statute, however, specifically provides that "[p]rior to the [transfer] hearing, the juvenile court shall order and obtain a complete diagnostic study, social evaluation, and full investigation of the child, his circumstances, and the circumstances of the alleged offense." *See* Tex. Fam. Code Ann. § 54.02(d). The statutory requirement of a complete diagnostic study bears upon the maturity and sophistication of the child and relates to the questions of culpability, responsibility for conduct, and ability to waive rights intelligently and assist in the preparation of a defense. *In re B.T.*, 323 S.W.3d 220, 223 (Tex. App.—Tyler, orig. proceeding) (mem. op.), *mand. granted*, 323 S.W.3d 158 (Tex. 2010) (orig. proceeding). Thus, "[a]t the transfer hearing the court may consider written reports from probation officers, professional court employees, or professional consultants in addition to the testimony of witnesses." *Id.* § 54.02(e).

As to whether a juvenile court is limited to ordering a single psychological evaluation, the Houston First Court of Appeals has explained that

---

Appellant then sets forth Rule 403's prohibition of evidence that is unfairly prejudicial prior to stating that "[t]he introduction of the 2020 psychological [evaluation] and the doctor's testimony only added more subjective testimony unsupported by objective scientific test results." Because Appellant's issue on appeal is not directed to a Rule 403 ground but is in the nature of an attack on an expert opinion under Rule 702, his Rule 403 trial objection is not pertinent to our analysis of the issue that he raises on appeal.

in determining a certification matter on its merits, neither the Family Code nor case law limits the authority of a [juvenile] court to the receipt of a single psychological evaluation report, or forbids the [juvenile] court to order any relevant investigations it may deem necessary. . . .

. . . .

The requirements of § 54.02(d) have been held to be mandatory and must be strictly followed. "Diagnostic study" has been construed to include psychologists' evaluations. The qualitative content of a diagnostic study is the paramount concern of the juvenile trial court. The determination of what constitutes a "full investigation" is for the [juvenile] court. It is a matter of logical deduction, then, to interpret § 54.02(d) as allowing the [juvenile] court to supplement, if not substitute, portions of diagnostic study when it is not satisfied with the quality or depth of the original.

*In re R.L.H.*, 646 S.W.2d 499, 501–02 (Tex. App.—Houston [1st Dist.] 1982, no writ) (citations omitted).

The record demonstrates that the juvenile court complied with the mandatory provisions of Section 54.02(d) by ordering a psychological evaluation prior to the second hearing and was allowed, pursuant to Section 54.02(e), to consider the results of and the testimony about Appellant's October 2020 psychological evaluation. *See* Tex. Fam. Code Ann. § 54.02(d), (e). Moreover, the juvenile court was not prohibited from ordering a new psychological evaluation prior to the second transfer hearing to assist with its determination of Appellant's maturity and sophistication. *See R.L.H.*, 646 S.W.2d at 501–02; *see also B.T.*, 323 S.W.3d at 223.

Appellant also challenges the timing of the 2020 psychological evaluation as follows:

48

> The October 2020 psychological exam was not a measure of the 14-year-old boy alleged to have committed a serious crime. It was a measure of a young man one month shy of his 17th birthday. It was an exam taken after 926 days in juvenile confinement. It was an exam taken after the benefit of 600 days of education in detention. [Record references omitted.]

Appellant, however, does not cite any law for his timing argument, and the law is contrary to his position. The timing of the evaluation does not alter the results as "intellectual disability is by definition a permanent condition." *See Busby v. Davis*, 925 F.3d 699, 713 (5th Cir. 2019) (op. on reh'g), *cert. denied*, 140 S. Ct. 897 (2020); *see also Heller v. Doe*, 509 U.S. 312, 323, 113 S. Ct. 2637, 2644 (1993) ("Mental retardation is a permanent, relatively static condition . . . .").

In addition to his arguments challenging the 2020 psychological evaluation, Appellant argues that Dr. Jeter stood by her conclusion from the 2019 psychological report that Appellant was not "mentally retarded," that she did not fully discuss the 2018 psychological report, that she did not administer any recognized adaptive functioning tests to support her conclusion that Appellant's advanced maturity was gained through "street knowledge and awareness," and that she did not explain why she did not administer any testing to show malingering when she concluded that the 2019 IQ testing underestimated Appellant's intellectual and academic ability. Dr. Jeter, however, was not required to expound on the prior testing when her conclusion about Appellant's maturity and sophistication was supported by the 2020 psychological evaluation, and we have held above that such evaluation was authorized

49

and that the trial court could rely on it. And because the juvenile court sat as factfinder and evaluated the witnesses in person, it was the sole judge of their credibility and could choose to believe or disbelieve a witness's testimony in whole or part, including an expert witness's testimony like that of Dr. Jeter. *See In re T.S.*, No. 02-20-00353-CV, 2021 WL 733305, at *3 (Tex. App.—Fort Worth Feb. 25, 2021, no pet. h.) (mem. op.). The juvenile court was thus entitled to believe Dr. Jeter's testimony without requiring additional adaptive testing to support it. *See In re D.M.*, No. 13-17-00319-CV, 2018 WL 460811, at *6–7 (Tex. App.—Corpus Christi–Edinburg Jan. 18, 2018, no pet.) (mem. op.) (upholding juvenile court's finding that appellant was sufficiently sophisticated and mature to stand trial as an adult, even though appellant had been diagnosed as intellectually disabled, because evidence included testimony from an expert who opined that appellant was "street smart" and possessed a maturity sufficient to understand the behaviors that he had engaged in).

Appellant further argues that Dr. Jeter's conclusion about his maturity and sophistication was controverted by the psychological testing showing that he was operating academically as a seven- to ten-year-old child and by her testimony about brain development.[18]  On redirect, Dr. Jeter explained that the psychological

---

[18]Appellant claims that "Dr. Jeter concluded that it was possible that [Appellant] was not even on the continuum [of brain development]." During cross-examination, defense counsel had asked Dr. Jeter, "[I]f there's a maturity continuum from 16 to 25, [Appellant's age at the time of the offenses was] before that continuum starts?" Dr. Jeter's response was as follows: "They typically call that middle

examinations produced a measure of an educational level, not a functional level. And nothing about Dr. Jeter's testimony regarding brain development continuing until age twenty-five undermined her conclusion about Appellant's maturity and sophistication.

Appellant also points to the following testimony to show that the evidence is factually insufficient to support the juvenile court's sophistication-and-maturity finding: Detective Barron's testimony that "there's not a lot of maturity in [the offense]"; the probation officer's testimony that Appellant had academic difficulties; the probation officer's testimony from the prior trial that Appellant could benefit from staying in the juvenile system; and his mother's testimony that Appellant had struggled with mastering language skills as far back as preschool and had received his first 504 education plan in third grade. Detective Barron, however, clarified that his maturity comment went toward maturity as a seasoned, lifelong criminal, and he further expounded that Appellant knew what he did was wrong as evidenced by ridding himself of the stolen items, the clothing he had worn while committing the offenses, and the gun. *See J.R.*, 2021 WL 777090, at \*9 (stating that attempts to conceal evidence of the crime may show sophistication and maturity and indicate that a person appreciates that his conduct is wrongful). Detective Barron's testimony thus supports the juvenile court's finding on the sophistication-and-maturity factor. With regard to the probation officer's testimony and Appellant's mother's testimony about

---

adolescence versus the late adolescence and early adulthood." Defense counsel, however, did not object to the nonresponsive answer.

Appellant's academic struggles and the probation officer's prior testimony about whether Appellant could benefit from staying in the juvenile justice system, such testimony does not render the juvenile court's sophistication-and-maturity finding against the great weight and preponderance of the evidence. *See C.M.M.*, 503 S.W.3d at 708.

Having reviewed all of the evidence, we conclude that it shows that Appellant could appreciate the nature and effect of his actions and understood right from wrong. The evidence also shows that he could assist in his defense. Accordingly, we hold that the juvenile court's finding that Appellant "is of sufficient sophistication and maturity to be tried as an adult" is not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See J.R.*, 2021 WL 7770909, at *10 (holding evidence factually sufficient to support Section 54.02(f)(2) finding because, among other evidence, psychologist concluded that appellant was "not a person with mental retardation or a person with significant mental illness" and that appellant appeared to be capable of understanding the legal implications of a discretionary transfer motion and of assisting his attorney in his defense); *In re A.F.*, No. 11-20-00199-CV, 2021 WL 687294, at *4–5 (Tex. App.—Eastland Feb. 23, 2021, no pet.) (mem. op.) (holding evidence factually sufficient to support Section 54.02(f)(2) finding despite low level of maturity because doctor who administered IQ test explained that appellant "did not seem to be intellectually disabled in any way, despite the low score [66] on an IQ test—a test on which [a]ppellant did not seem to put effort"); *C.M.M.*,

503 S.W.3d at 707 (holding evidence factually sufficient to support Section 54.02(f)(2) finding because doctor testified that appellant had no intellectual deficits or naïveté compared to children his age, showed no signs of a thought disorder, had no history of inpatient or outpatient psychiatric services, and was able to make good decisions when he chose to do so); *In re K.D.S.*, 808 S.W.2d 299, 302–03 (Tex. App.—Houston [1st Dist.] 1991, no writ) (holding evidence factually sufficient to support sophistication-and-maturity finding because juvenile had an IQ "just above the retarded range" and had the maturity of a nine- to eleven-year-old child when evidence showed juvenile was capable of understanding proceeding, could assist her attorneys in her defense, and was intellectually capable of distinguishing right from wrong).

Having so concluded, we next consider whether the juvenile court abused its discretion by waiving jurisdiction and transferring Appellant's case to criminal court. *See C.M.M.*, 503 S.W.3d at 701. The juvenile court's order reflects findings that all of the Section 54.02(f) factors supported waiver and transfer. Appellant challenged only the factual sufficiency of the sophistication-and-maturity prong; he has not challenged that the State met the three remaining factors.[19] Given the evidence before us and the

---

[19]We note that there need not be evidence in support of every Section 54.02(f) factor weighing in favor of transfer, so long as there is sufficient overall evidence to justify the juvenile court's decision. *See J.R.*, 2021 WL 777090, at *10 n.5. Here, Appellant does not argue that the remaining factors were unsupported by the evidence nor does he analyze them in context of the juvenile court's overall decision; rather, he implies that error on the sophistication-and-maturity prong cannot be

juvenile court's findings, we further conclude that the juvenile court did not abuse its discretion by waiving its jurisdiction and transferring Appellant's case to criminal court because the record shows that the juvenile court acted with reference to guiding rules and principles in reaching its decision. *See J.R.*, 2021 WL 777090, at *10. We overrule Appellant's first point.

## VII. Conclusion

Having overruled Appellant's four points, we affirm the juvenile court's transfer order.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: May 6, 2021

---

harmless. Nothing in the statute elevates this prong any higher than the other factors that the juvenile court must consider. *See id.*